1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  ROBERT ALAN GIBBS,                   No. 2:13-CV-2631-KJM-CMK

12              Plaintiff,

13       vs.                           FINDINGS AND RECOMMENDATIONS

14  BOYD, et al.,

15              Defendants.

16  _____/

17              Plaintiff, who is proceeding pro se, brings this civil rights action.   Pending before

18  the court is defendants' unopposed motion for summary judgment (Doc. 30).[1]

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24

25       [1]       The motion is brought by defendants Edwards and Jackson ("county defendants").
Also before the court is a motion for summary judgment filed by remaining defendants Boyd and
26  Little ("state defendants"), which will be addressed separately.

1

# I. BACKGROUND

## A.    Plaintiff's Allegations

This action proceeds on the original complaint against defendants Boyd, Little, Edwards, and Jackson. Plaintiff claims:

> My property was stolen by dep. Edwards on 12/23/12. My home was searched without a warrant on 3/8/13 by Fish and Game officers Little, Boyd, and Gaveki based upon a false report by Edwards. Sgt. Jackson of Shasta Sheriff knew and did nothing. I had a gun put to my head. Have not been the same since. . . .

In a statement attached to the complaint, plaintiff adds:

> On December 23rd of 2012, I dialed 911 to alert authorities that my truck was stuck in the snow hanging precariously over a cliff. After two days of being stuck in snow and mud, I decided to evacuate from my cabin at Bear Gulch (French Gulch). With me were my three small dogs who were tired and not minding very well. I was wet and muddy over my entire body and had actually slept for about 3 hours in my wet clothes the night before. Night time was approaching yet again and I asked the Sheriff's if they could pick me up or send a cab if I could make it out to the highway. I then started making my way to the highway with my dogs and also a shotgun that belonged to a friend of mine. When I made it to the road and made contact with the deputies they seemed perturbed that they had to come to this side of the county and they were inquiring sarcastically as to how long I had been "tramping." I told them that I was not tramping and that I had a cabin in the area. Even though I had peacefully given them my shotgun and it was now safely stowed in one of the patrol vehicles, they still insisted upon putting me in the back and handcuffing me. Deputy Edwards then transported me to the Motel 6 on Twin View Blvd. Where I have stayed many times. After uncuffing me and allowing me to make sure there was a room available, Deputy Edwards then informed me that he wanted to take my shotgun for "safe keeping." I told him that taking my shotgun was unnecessary that there was no prohibition against weapons at Motel 6, and that he did not have my permission to do so. Deputy Edwards then told me that he was going to take my weapon anyway. Because Deputy Edwards is a law enforcement officer, I was not going to argue further, and Edwards took the gun. He told me I could claim the gun the next day at the Sheriff's department. He told me to contact the property officer. But when I contacted the property officer the next day she told me that I was being charged with felon in possession and that I could not come pick it up.

> Throughout January and February, as mentioned in my letter, I did complain of what was happening to several Sheriff's employees and several people at the DA's office, including Sgt. Jackson, Sgt. Dupreaux, the investigator, and secretaries I spoke to at the DA's. Almost all of the people I spoke to were very unhelpful, seemed afraid to take action, and

seemed more than willing to do anything except help me to resolve the situation. As I ran into more and more brick walls, I found myself suffering from greater and greater level of anxiety and near psychotic levels of anger and frustration. All I wanted them to do was admit they were wrong and to make amends. It was their continued denial and complete apathy towards me that was the greatest disrespect and actually aggravated the situation beyond belief. Essentially, they wanted to get off on a false arrest on the cheap. They made a huge mistake and didn't want to pay for it. They didn't care how it was affecting me or if it continued to cause me psychological damage. Even if I was suicidal and completely depressed for days and weeks at a time, as long as they didn't have to pay, they were fine with it.

On March 8th, 2013, one day before my 41st birthday, while in my yard raking up leaves, I simultaneously heard and saw three men with pistols and a rifle and a german shepard [sic] run very fast into my yard screaming for me to lay on the ground. At the time, I did not know these men were Fish and Game and one of them as he ran into the yard was pointing a high powered rifle in the general direction and level with my head. I complied and layed [sic] on the ground at which point I did notice that these men wore uniforms. Within a few second I ascertained who these men were and why they were there. Immediately into interviewing me, the officer I would later learn was Brian Boyd began asking me where my guns were. When I said I had no guns, officer Boyd said I had two 38 caliber pistols registered to me. I have never in my life owned a registered 38 caliber pistol. It seemed to me at the time that it was just an excuse to make sure I didn't have any weapons (in essence, so the offices could come in with guns drawn since they didn't have any solid intelligence on me and didn't know what they were coming into). Officer Boyd also asked me where my "partner" was, when I said I lived alone and had lived alone the entire time I have been up here, he said we had information that there was someone else up here living with you. Again, I believe that this was Boyd's fabricating intelligence so that he could come in with 3 men well armed, as added security to him and his men, with no regard to whether or not I was alone unarmed and would go peacefully. Despite the fact that they had only the false arrest warrant for the Edwards case, Officer Boyd and Officer Little did nonetheless conduct an illegal search of my residence and property. Officer Boyd and Officer Little both entered my cabin and began asking me "where is the dope" to which I replied "I don't have any dope." Officer Little noticed some plastic tubs and asked me what was in them. I told him it was dirty clothes and hangers, which it was. They also asked me that was in the jars in my rafters. I told them they were empty. When we went back out into the yard Boyd asked again where the dope was. I showed him the six plants I had that were about a foot tall inside a dog cage. After hog tying me with some kind of a rope and leaving me in the custody of Officer Gauweki, both Officers Boyd and Little got into their truck and drove up a logging road on my property, apparently to search for more marijuana. I was then transported to Shasta County Jail on the felony warrant based upon Edwards' complaint. My dogs were left in my cabin by Fish and Game and I was able to leave them enough water and food for about a day. I was

told by Boyd that I would probably be processed out in a few hours. But when I got to the jail, I found out that my bail was $100,000, the premium of which I would have to pay was $10,000 cash, payable to the bondsmen within one month of my release. On Monday, March 11th, after three days in jail, not knowing if my dogs were ok and not knowing how much longer I would have to wait to get some other kind of release, I agreed to be bonded out.

**B.**     **Prior State Court Action**

On December 6, 2013, plaintiff filed a small claims action in the Shasta County Superior Court against the Shasta County Sheriff's Department.[2] Plaintiff claimed:

I was falsely and maliciously charged by Dep. Edwards with a crime I did not commit. I paid $10,000.00 in bond. Charge dismissed.

Following a bench trial, the court issued a written decision on March 18, 2014. In that decision, the court stated:

This case presents the question whether the County has liability to reimburse a defendant for the bond premium paid by him where the underling criminal charges are later dismissed. The court has found no case addressing this specific factual situation.

The court instead examines the plaintiff's claim as one for damages stemming from false imprisonment. For purposes of analysis only, the court accepts as true the facts as offered by plaintiff that due to actions in another county a felony conviction appeared on the plaintiff's computerized law enforcement records, and that the conviction should not have so appeared, the felony charges having been dismissed in that other county. The court also finds the following facts were established by the evidence at trial:

1)    The plaintiff was in possession of a firearm at the time of contact by a sheriff's deputy;

2)    That the same sheriff's deputy checked the computerized law enforcement records and found that the plaintiff had a felony conviction;

3)    That based on the recorded felony conviction, the deputy determined there was probable cause to believe the plaintiff had committed the crime of being a felon in possession of a

---

[2]     The court may take judicial notice of state court records. See Kasey v. Molybdenum Corp. of America, 336 F.2d 560, 563 (9th Cir. 1964).

firearm;

    4)     That the district attorney filed a criminal complaint and sought and obtained a court ordered arrest warrant;

    5)     The warrant was regular on its face;

    6)     That the department of Fish and Game executed the warrant and took the plaintiff into custody;

    7)     That the plaintiff posted bail to get out of custody, at the cost of $10,000.00; and

    8)     That the criminal complaint was dismissed at arraignment.

The court notes that there was a factual dispute about whether the plaintiff consented to the deputy taking possession of the firearm or not. The court finds it unnecessary to resolve this dispute as immaterial to the present controversy.

Addressing the merits of plaintiff's false imprisonment claim, the court ruled against plaintiff concluding that liability did not exist because the arrest warrant was regular on its face and, therefore, provided a lawful reason to take plaintiff into custody. The court specifically found: "The fact that the sheriff, or his agent, did not investigate whether the computerized law enforcement record of the conviction was in error is not sufficient to show malice."

## C.   Defendants' Evidence

According to defendants:

On December 23, 2012, defendant Shasta County Sheriff's Deputy Chris Edwards responded to a request for assistance from an individual who said he had got stuck in the snow, and was walking along Highway 299. When Edwards arrived on the scene, he encountered plaintiff Robert Gibbs with three dogs and a shotgun. Plaintiff initially asked for medical assistance, refused it when the paramedics arrived, and then asked to be transported to a Motel 6 in Redding. Edwards accommodated plaintiff, but when they arrived, as a matter of safekeeping, took possession of the shotgun, telling plaintiff he could retrieve it in the morning. After he dropped plaintiff off, Edwards ran a routine background check through the CLETS/NCIS database. The database showed that plaintiff had a felony conviction, which meant his possession of the shotgun was itself a felony. Edwards forwarded the information to the Shasta County District Attorney's office, which filed charges against plaintiff as a felon in possession of a firearm. Plaintiff was subsequently arrested by California Department of Fish and Wildlife agents in part, it appears, on the basis of the District Attorney's charge. He spent three days in jail, but was

5

1   released after posting bail.

2   As it turned out, the felony conviction had been reduced to a misdemeanor, but the CLETS/NCIS database Edwards consulted had not

3   been updated to reflect the change in status.  The District Attorney dropped the charges.

4

5   Defendants' evidence, which is not disputed by plaintiff, shows the following facts:

6   1.   Edwards had public safety concerns about plaintiff, who appeared unstable, though Edwards did not believe plaintiff met the requirements

7   for involuntary commitment under California Welfare and Institutions Code § 5150.

8

9   2.   Edwards took plaintiff's shotgun for safekeeping based on his safety concerns.

10   3.   Edwards' expectation at the time he seized the shotgun was that plaintiff would be able to reclaim it the following day.

11

12   4.   After dropping plaintiff at the Motel 6, Edwards used the CLETS/NCIS database to run a routine criminal background check on plaintiff as part of

13   normal procedure.

14   5.   Edwards' check revealed that plaintiff had a prior felony conviction, and there was no indication on the CLETS/NCIS database that the conviction had been reduced to a misdemeanor.

15

16   6.   Now believing that plaintiff was a felon in possession of a firearm in violation of California Penal Code § 29800(A)(1), Edwards forwarded his incident report and a copy of plaintiff's criminal history to the Shasta

17   County District Attorney's Office.

18   7.   Edwards had no other role in subsequent proceedings against plaintiff.

19   8.   At the time he was contacted by plaintiff, Jackson was the on-duty Watch Commander.

20

21   9.   Jackson was helpful and even provided plaintiff his cellphone number.

22   10.   Jackson asked plaintiff to provide him with any documentation showing that the felony conviction had been reduced.

23   11.   Records later faxed to Jackson by the Humboldt County Public Defender's Office did not show that plaintiff's felony conviction had been reduced to

24   a misdemeanor but showed that the provision for a reduction had been crossed out, apparently by the judge.

25

26   12.   Jackson then told plaintiff he should contact the Shasta County District Attorney's Office.

6

1              In his declaration filed in support of summary judgment, defendant Edwards states

2    in relevant part as follows:

3           2.     On Sunday, December 23, 2012, at approximately 1800
hours, Shasta County Sheriff's Sergeant Gonzalez and I responded to

4    dispatch regarding a call from a male who I later learned was Robert Gibbs
who was stuck in the snow and needed assistance in the area of Highway

5    299 near Trinity Mountain Road. Dispatch further explained that Gibbs
mentioned he was carrying a shotgun.

6           3.     My review of the dispatch printouts from the date of this
incident indicates that dispatch also received information from a passerby

7    stating that Mr. Gibbs told the passerby that he (Gibbs) was very angry at
the world and that he doesn't like police.

8           4.     As I approached the area, I saw an individual walking east-
bound with what appeared to be a shotgun. I made contact and I asked

9    him to place the gun on the ground. He complied. He identified himself
as Robert Gibbs. I placed him in handcuffs for officer safety reasons.

10          5.     Mr. Gibbs appeared to me to be upset, and began making
bizarre statements about being homeless and living in a shack in the

11   mountains, but refused to tell me where it was. He then asked for medical
assistance due to chest pains. When medical staff arrives, however, he

12   refused any care.

13          6.     Mr. Gibbs asked to be transported with his dogs to a Motel
6 in Redding. Although I was concerned about his behavior and, based on
his bizarre and rambling statements, believed him to be unstable mentally,

14   he did not meet the criteria for Cal. Welfare and Institutions Code § 5150
involuntary commitment, so I agreed to take him to the motel.

15          7.     When we arrived at the motel, I asked Mr. Gibbs if it was
okay with him if I retained his shotgun for safekeeping, explaining that I

16   did not think it a good idea for him to be carrying a shotgun into the hotel.
Based on my conversation with Mr. Gibbs, I believed that he agreed with

17   me. Based on that belief, and because I had public safety concerns about
Mr. Gibbs, who appeared unstable, carrying a shotgun in a public place

18   like a motel, I retained possession of the shotgun. I gave Mr. Gibbs a
property sheet for the shotgun, explaining to him that it would be logged

19   for safekeeping. Mr. Gibbs told me he understood.

20   In his declaration, defendant Jackson states in relevant part:

21          2.     In January of 2013, I received a number of telephone calls
from Robert Gibbs concerning official records indicating that he was a

22   convicted felon.

23          3.     I am informed and believe and on that basis allege that a
search of the CLETS/NCIS database had indicated that Mr. Gibbs had a
felony conviction, and that the conviction listed in the database formed the

24   basis for a charge to be brought against him by the Shasta County District
Attorney as a felon in possession of a firearm.

25

26   ///

4.      Mr. Gibbs informed me that the felony conviction at issue had been reduced to a misdemeanor.  I attempted to be helpful with Mr. Gibbs, giving him my cell phone number, and asking him to provide me with documentation confirming that the felony had been reduced to a misdemeanor.

5.      I subsequently received records by fax from the public defender's office in Humboldt County, but those records did not support Mr. Gibbs' contention that his felony conviction had been reduced to a misdemeanor.  Because those records were inconsistent with Mr. Gibbs' contentions, I told him that he would need to contact the District Attorney. When Mr. Gibbs first called me, the case in chief had already been sent to the Shasta County District Attorney's Office and an arrest warrant had already been filed by the courts and entered into the NCIS system for Mr. Gibbs' arrest.  At the time of receiving the phone call from Mr. Gibbs, I was the on-duty Watch Commander for patrol and was not involved with the case.  I had involvement with the incident report concerning Deputy Edwards' contact with Mr. Gibbs that I am informed and believe and on that basis allege had been forwarded to the District Attorney's Office.

## II.  STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

. . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

1    If the moving party meets its initial responsibility, the burden then shifts to the

2  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4  establish the existence of this factual dispute, the opposing party may not rely upon the

5  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6  form of affidavits, and/or admissible discovery material, in support of its contention that the

7  dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

8  opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

9  affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

10  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

11  (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

12  could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433,

13  1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more

14  than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the

15  record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

16  there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is

17  sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the

18  parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

19    In resolving the summary judgment motion, the court examines the pleadings,

20  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

21  any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see

22  Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed

23  before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

24  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

25  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

26  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

1   1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for

2   the judge, not whether there is literally no evidence, but whether there is any upon which a jury

3   could properly proceed to find a verdict for the party producing it, upon whom the onus of proof

4   is imposed."  <u>Anderson</u>, 477 U.S. at 251.

5

6                                    **III.  DISCUSSION**

7            As defendants note, plaintiff's complaint alleges of a "constellation of events" but

8   does not specify any particular basis for liability against any of the named defendants.  Plaintiff

9   claims that his "property [shotgun] was stolen" by defendant Edwards, that his home was

10  "searched without a warrant" by non-moving defendants Boyd and Little, and that defendant

11  Jackson "knew and did nothing."  More specifically as to defendant Edwards, plaintiff claims

12  that, despite his protestation that the officer did not have his permission to do so, defendant

13  Edwards seized his shotgun.  Plaintiff also claims that the search was "based upon a false report

14  by Edwards."  As to defendant Jackson, plaintiff claims that he complained about "what was

15  happening" to several people, including defendant Jackson, but that "[a]lmost all of the people I

16  spoke to were very unhelpful, seemed afraid to take action, and seemed more than willing to do

17  anything except help me to resolve the situation."

18          Given plaintiff's specific allegations, the court finds that plaintiff is attempting

19  to articulate the following federal claims against the moving defendants: (1) defendant Edwards

20  violated plaintiff's Fourth Amendment rights by seizing the shotgun and providing a false report;

21  and (2) defendant Jackson is liable for the conduct of other defendants.  It is also possible that

22  plaintiff is attempting to state a claim against defendant Edwards under the Second Amendment

23  based on seizure of plaintiff's shotgun.  As to these claims, defendants Edwards and Jackson

24  argue they are entitled to judgment in their favor as a matter of law.[3]

25  ─────────────────

26          [3]      Defendants also argue that they are entitled to judgment as a matter of law to the
    extent plaintiff states a state law false imprisonment claim.  The court finds no such claim –

10

### A.   **Defendant Jackson**

The undisputed evidence establishes that defendant Jackson was the on-duty Watch Commander at the time of his initial contact with plaintiff in January 2013.  Supervisory personnel are generally not liable under § 1983 for the actions of their employees.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding that there is no respondeat superior liability under § 1983).  A supervisor is only liable for the constitutional violations of subordinates if the supervisor participated in or directed the violations.  See id.  The Supreme Court has rejected the notion that a supervisory defendant can be liable based on knowledge and acquiescence in a subordinate's unconstitutional conduct because government officials, regardless of their title, can only be held liable under § 1983 for his or her own conduct and not the conduct of others.  See Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).  Supervisory personnel who implement a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may, however, be liable even where such personnel do not overtly participate in the offensive act.  See Redman v. Cnty of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).

When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of supervisory personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).  "[A] plaintiff must plead that each Government-official defendant, through the

---

which was litigated in state court – presented in the current complaint.  Plaintiff's only possible suggestion of such a claim in the complaint is his allegation of a "false arrest warrant."  This allegation, however, was made in the context of plaintiff's allegation that non-moving defendants Boyd and Little searched his property without a valid warrant or probable cause.  In context, plaintiff alleges: "Despite the fact that they had only the false arrest warrant for the Edwards case, Officer Boyd and Officer Little did nonetheless conduct an illegal search of my residence and property."

1   official's own individual actions, has violated the constitution." Iqbal, 129 S.Ct. at 1948.

2          In this case, defendants' evidence shows that defendant Jackson attempted to

3   assist plaintiff with his concerns and ultimately referred plaintiff to the District Attorney's Office.

4   Plaintiff has not presented any evidence to the contrary.  Nor has plaintiff presented any evidence

5   that Jackson implemented a constitutionally deficient policy.  The court agrees with defendants

6   that defendant Jackson is entitled to judgment as a matter of law.

7          **B.     Defendant Edwards**

8          As to plaintiff's claim against Edwards based on seizure of the shotgun,

9   defendants argue that defendant Edwards' conduct constituted a permissible community

10  caretaking function.  Defendants primarily rely on Shields v. Tracy, 2:03-CV-1614-DFL-PAN,

11  2005 WL 1490300 (E.D. Cal. 2009), the only in-circuit case cited in their brief.  In that case, the

12  plaintiff sued alleging civil rights violations arising from her arrest.  The court recognized a

13  "community caretaker" exception to the probable cause requirement for seizing a person, noting

14  that such stops are akin to stops allowed under Terry v. Ohio, 392 U.S. 1 (1968).  Ultimately, the

15  court in Shields concluded that the exception did not apply.

16         Shields is unpersuasive.  In that case, the community caretaker exception was

17  discussed in the context of the plaintiff's claim that she had been improperly stopped and

18  detained by the police, not that her property had been improperly seized as is plaintiff's claim in

19  this case.  Additionally, unlike the plaintiff in Shields, plaintiff in this case was not being

20  detained, held in custody, or placed under arrest at the time defendant Edwards seized the

21  shotgun.  Defendants have not cited any Ninth Circuit authority supporting the proposition that a

22  community caretaker exception applies to seizures of property occurring under the circumstances

23  presented in this case.

24  ///

25  ///

26  ///

1    Defendants appear to concede the point.  In their brief, defendants state:

2         The 9th Circuit has limited *searches* under the community
     caretaking function to vehicles (*see U.S. v. Erickson*, 991 F.2d 529, 530-
3    532 (9th Cir. 1993)), but defendants' research has not revealed a Ninth
     Circuit case ruling on its application to the seizure of weapons that are not
4    in vehicles.  Two cases from this District recognize, based on out-of-
     circuit opinions, that the community caretaking function extends to
5    seizures of *individuals* who appear to be a danger to themselves or others.
     *See Shields v. Tracy*, 2005 WL 1490300 at *6 and cases cited therein;
6    *Kaur v. City of Lodi*, 214 WL 3889976 at *5 (E.D. Cal. 2014). . . . (italics
     in defendants' brief).

7

8    As defendants correctly observe, the cases from this district are distinguishable and no Ninth

9    Circuit case has held that the community caretaking exception applies to the seizure that occurred

10   here.

11        Given the state of the law in this circuit, defendants argue that defendant Edwards

12   is entitled to qualified immunity because his seizure of plaintiff's shotgun did not violate any law

13   which was clearly established at the time.  As defendants observe, government officials are

14   entitled to qualified immunity if his conduct did not "violate clearly established . . . constitutional

15   rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231

16   (2009).  In this case, assuming that defendant Edwards' seizure of plaintiff's shotgun violated the

17   Fourth Amendment, the court agrees with defendants that the law with respect to application of

18   the community caretaker exception is not clearly established now and was certainly not at the

19   time of the seizure in late 2012.  Defendant Edwards is entitled to qualified immunity.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' motion for summary judgment (Doc. 30) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


DATED:  March 4, 2016

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE