1

2

3

4

5

6

7

8                **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ROBERT ALAN GIBBS,                          No. 2:13-CV-2631-KJM-CMK

12                    Plaintiff,

13           vs.                                 <u>FINDINGS AND RECOMMENDATIONS</u>

14   BOYD, et al.,

15                    Defendants.

16   _____/

17           Plaintiff, who is proceeding pro se, brings this civil rights action.   Pending before

18   the court is defendants' motion for summary judgment (Doc. 43).[1]   The motion is unopposed.[2]

19   _____

20           [1]    The motion is brought by defendants Boyd and Little ("state defendants"). The
     motion for summary judgment filed by remaining defendants Edwards and Jackson ("county
21   defendants") was addressed in findings and recommendations issued on March 4, 2016.

22           [2]    Plaintiff filed a "Notice of Non-Receipt" on March 30, 2016, in which he states
     that he has not received a copy of defendants' motion.  There is no proof of service
23   accompanying this document indicating that plaintiff served this notice on defendants or
     otherwise sought re-service of their motion to a different address.  Moreover, a review of the
24   docket reflects that defendants' motion was served on plaintiff on December 18, 2015, at his
     address of record at that time – P.O. Box 944255, Sacramento, CA 94244-2550.  It was not until
25   February 29, 2016, that plaintiff filed a notice of change of address indicating that he is now
     incarcerated at the Shasta County Jail in Redding, CA.  Therefore, defendants' motion was
26   properly served.

                                              1

# I. BACKGROUND

### A.   Plaintiff's Allegations

This action proceeds on the original complaint against defendants Boyd, Little, Edwards, and Jackson.  Plaintiff claims:

> My property was stolen by dep. Edwards on 12/23/12.  My home was searched without a warrant on 3/8/12 by Fish and Game officers Little, Boyd, and Gaveki based upon a false report by Edwards.  Sgt. Jackson of Shasta Sheriff knew and did nothing.  I had a gun put to my head.  Have not been the same since. . . .

In a statement attached to the complaint, plaintiff adds:

> On December 23rd of 2012, I dialed 911 to alert authorities that my truck was stuck in the snow hanging precariously over a cliff.  After two days of being stuck in snow and mud, I decided to evacuate from my cabin at Bear Gulch (French Gulch).  With me were my three small dogs who were tired and not minding very well.  I was wet and muddy over my entire body and had actually slept for about 3 hours in my wet clothes the night before.  Night time was approaching yet again and I asked the Sheriff's if they could pick me up or send a cab if I could make it out to the highway.  I then started making my way to the highway with my dogs and also a shotgun that belonged to a friend of mine.  When I made it to the road and made contact with the deputies they seemed perturbed that they had to come to this side of the county and they were inquiring sarcastically as to how long I had been "tramping."  I told them that I was not tramping and that I had a cabin in the area.  Even though I had peacefully given them my shotgun and it was now safely stowed in one of the patrol vehicles, they still insisted upon putting me in the back and handcuffing me.  Deputy Edwards then transported me to the Motel 6 on Twin View Blvd. Where I have stayed many times.  After uncuffing me and allowing me to make sure there was a room available, Deputy Edwards then informed me that he wanted to take my shotgun for "safe keeping."  I told him that taking my shotgun was unnecessary that there was no prohibition against weapons at Motel 6, and that he did not have my permission to do so.  Deputy Edwards then told me that he was going to take my weapon anyway.  Because Deputy Edwards is a law enforcement officer, I was not going to argue further, and Edwards took the gun.  He told me I could claim the gun the next day at the Sheriff's department.  He told me to contact the property officer.  But when I contacted the property officer the next day she told me that I was being charged with felon in possession and that I could not come pick it up.

> Throughout January and February, as mentioned in my letter, I did complain of what was happening to several Sheriff's employees and several people at the DA's office, including Sgt. Jackson, Sgt. Dupreaux, the investigator, and secretaries I spoke to at the DA's.  Almost all of the people I spoke to were very unhelpful, seemed afraid to take action, and

seemed more than willing to do anything except help me to resolve the situation.  As I ran into more and more brick walls, I found myself suffering from greater and greater level of anxiety and near psychotic levels of anger and frustration.  All I wanted them to do was admit they were wrong and to make amends.  It was their continued denial and complete apathy towards me that was the greatest disrespect and actually aggravated the situation beyond belief.  Essentially, they wanted to get off on a false arrest on the cheap.  They made a huge mistake and didn't want to pay for it.  They didn't care how it was affecting me or if it continued to cause me psychological damage.  Even if I was suicidal and completely depressed for days and weeks at a time, as long as they didn't have to pay, they were fine with it.

On March 8th, 2013, one day before my 41st birthday, while in my yard raking up leaves, I simultaneously heard and saw three men with pistols and a rifle and a german shepard [sic] run very fast into my yard screaming for me to lay on the ground.  At the time, I did not know these men were Fish and Game and one of them as he ran into the yard was pointing a high powered rifle in the general direction and level with my head.  I complied and layed [sic] on the ground at which point I did notice that these men wore uniforms.  Within a few second I ascertained who these men were and why they were there.  Immediately into interviewing me, the officer I would later learn was Brian Boyd began asking me where my guns were.  When I said I had no guns, officer Boyd said I had two 38 caliber pistols registered to me.  I have never in my life owned a registered 38 caliber pistol.  It seemed to me at the time that it was just an excuse to make sure I didn't have any weapons (in essence, so the officers could come in with guns drawn since they didn't have any solid intelligence on me and didn't know what they were coming into).  Officer Boyd also asked me where my "partner" was, when I said I lived alone and had lived alone the entire time I have been up here, he said we had information that there was someone else up here living with you.  Again, I believe that this was Boyd's fabricating intelligence so that he could come in with 3 men well armed, as added security to him and his men, with no regard to whether or not I was alone unarmed and would go peacefully.  Despite the fact that they had only the false arrest warrant for the Edwards case, Officer Boyd and Officer Little did nonetheless conduct an illegal search of my residence and property.  Officer Boyd and Officer Little both entered my cabin and began asking me "where is the dope" to which I replied "I don't have any dope."  Officer Little noticed some plastic tubs and asked me what was in them.  I told him it was dirty clothes and hangers, which it was.  They also asked me what was in the jars in my rafters.  I told them they were empty.  When we went back out into the yard Boyd asked again where the dope was.  I showed him the six plants I had that were about a foot tall inside a dog cage.  After hog tying me with some kind of a rope and leaving me in the custody of Officer Gauweki, both Officers Boyd and Little got into their truck and drove up a logging road on my property, apparently to search for more marijuana.  I was then transported to Shasta County Jail on the felony warrant based upon Edwards' complaint.  My dogs were left in my cabin by Fish and Game and I was able to leave them enough water and food for about a day.  I was

told by Boyd that I would probably be processed out in a few hours.  But when I got to the jail, I found out that my bail was $100,000, the premium of which I would have to pay was $10,000 cash, payable to the bondsmen within one month of my release.  On Monday, March 11th, after three days in jail, not knowing if my dogs were ok and not knowing how much longer I would have to wait to get some other kind of release, I agreed to be bonded out.

B.     **Defendants' Evidence**

According to defendants:

Plaintiff Robert Alan Gibbs (Plaintiff) alleges that Defendant Brian Boyd (Warden Boyd) and Defendant DeWayne Little (Lieutenant Little), officers of the Department of Fish and Wildlife (DFW), violated his civil rights by entering his property without a warrant based on a false report by Shasta County Sheriff Deputies, and that they entered his property and cabin illegally, without his consent, to search for marijuana.

This case was initiated when DFW received complaints that Plaintiff was unlawfully performing streambed alterations.  Defendants' primary job duties include investigation of Fish and Game Code violations, such as unlawful streambed alterations.

Warden Boyd, who headed the investigation of the streambed alteration complaint for DFW, found that Plaintiff had a $100,000 weapons-related felony warrant for his arrest.  Warden Boyd verified the warrant with the Shasta County Sheriff's Department, which issued the warrant.  He also verified the warrant with his DFW dispatch.  Warden Boyd also found that Plaintiff should be considered dangerous.  He took reasonable precautions to ensure safe execution of the arrest warrant and property search by, among other things, requesting the assistance of two other DFW officers, including Lieutenant Little.

* * *

On March 8, 2013, at approximately 1:00 p.m., Warden Boyd, his police K-9, Lieutenant Little, and DFW Warden Aaron Galwey (collectively the officers), responded to investigate complaints that Plaintiff Robert Alan Gibbs was unlawfully performing streambed alterations in a rural mountain area southeast of Buckhorn Summit on Highway 299. (Citations to defendants' statement of undisputed facts and evidence omitted).

* * *

Based on the reports he had received about Plaintiff [regarding the outstanding weapons-related felony warrant], and because Plaintiff was considered dangerous, Warden Boyd did not think he should make contact with Plaintiff by himself.  He requested the assistance of Lieutenant Little and Warden Aaron Galwey.  He thought their assistance would help to ensure that Plaintiff's arrest and the investigation of Fish and Game Code

4

violations were executed safely.

* * *

When the officers attempted to make contact with Plaintiff on March 8, 2013, Warden Boyd drove a DFW truck and Lieutenant Little drove a DFW truck with Warden Galwey as his passenger.  When the officers reached the road to Plaintiff's property, Warden Boyd parked his truck off of highway 299 at the base of the road to Plaintiff's property, then he and his police K-9 entered the bed of Lieutenant Little's truck.

On the drive to Plaintiff's property, Warden Boyd observed environmental damage on the adjacent landowner's property, which he believed Plaintiff had caused based on the complaints he had received and which Plaintiff later admitted.  Warden Boyd photographed streambed alteration where Plaintiff admittedly filled stream courses and installed culverts without notification.

* * *

On the drive to Plaintiff's property, the officers encountered two gates that were on property adjacent to Plaintiff's property.  The officers parked at the third gate, which was the entrance to Plaintiff's property.  Warden Boyd exited Lieutenant Little's pickup with his police K-9 and walked around the gate, through open fields, and down a narrow roadway.  Neither Warden Boyd nor Lieutenant Little ever opened, passed through, or passed over a gate, fence, or any other enclosure to enter Plaintiff's property.

Warden Boyd saw smoke coming up through the trees ahead of him.  Warden Boyd and Lieutenant Little had handguns, and Warden Galwey had a long gun.  The officers made contact with Plaintiff outside his residence and arrested him for the weapons-related felony warrant.  Plaintiff did not resist the arrest.  At no time did Lieutenant Little or Warden Boyd point a gun at Plaintiff's head.

* * *

Lieutenant Little was concerned about the animals in Plaintiff's cabin, but he was not going to enter the house unless Plaintiff asked.  Plaintiff asked Lieutenant Little to take care of the dogs and lock the dogs in his house.  Plaintiff also asked Lieutenant Little to retrieve personal items from his cabin.

Before entering the house, Lieutenant Little explicitly stated to Plaintiff: "I am confirming right now that you are requesting that I enter your house to retrieve personal items and secure your dogs."  Plaintiff responded yes, he authorized Lieutenant Little to enter his house.  Lieutenant Little then stated: "You are sure you want me to go into your house and based on your consent alone, I have your permission to enter to secure your dogs and retrieve personal items."  Plaintiff again confirmed his express consent for Lieutenant Little to enter his cabin.  Lieutenant Little confirmed Plaintiff's consent a third time, and again Plaintiff agreed.

Defendants' statement of undisputed fact, which plaintiff has failed to challenge, is supported by defendants' declarations as well as excerpts from plaintiff's deposition in this matter.

## II.  STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

> Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

1   affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

2   242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630

3   (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

4   could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433,

5   1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more

6   than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the

7   record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

8   there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).  It is

9   sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the

10  parties' differing versions of the truth at trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

11          In resolving the summary judgment motion, the court examines the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

13  any.  <u>See</u> Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, <u>see</u>

14  <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed

15  before the court must be drawn in favor of the opposing party, <u>see</u> <u>Matsushita</u>, 475 U.S. at 587.

16  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

17  produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen</u>

18  <u>Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir.

19  1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for

20  the judge, not whether there is literally no evidence, but whether there is any upon which a jury

21  could properly proceed to find a verdict for the party producing it, upon whom the onus of proof

22  is imposed." <u>Anderson</u>, 477 U.S. at 251.

23  / / /

24  / / /

25  / / /

26  / / /

7

### III. DISCUSSION

Plaintiff claims that defendants violated his Fourth Amendment rights by conducting an illegal search of his property.  It also appears that plaintiff claims his arrest violated the Fourth Amendment.  To prevail on such claims in a § 1983 action, plaintiff must prove that the officers acted without probable cause.  See United States v. Collins, 427 F.3d 688 (9th Cir. 2005).  Defendants argue that plaintiff's Fourth Amendment claims fail as a matter of law because the undisputed evidence establishes that their actions were supported by probable cause as well as a facially valid warrant.

Whether probable cause existed is a question of law.  See Beck v. Ohio, 379 U.S. 89 (1964).  Probable cause exists when officers have a reasonable belief, under the totality of the circumstances, in the probability of criminal activity.  See Illinois v. Gates, 462 U.S. 213 (1983); see also Dubner v. City & County of San Francisco, 266 F.3d 959 (9th Cir. 2001); Torres v. City of Los Angeles, 548 F.3d 1197 (9th Cir. 2008).  Law enforcement officers may possess probable cause even where the officers' reasonable belief is mistaken.  See Beier v. City of Lewiston, 354 F.3d 1058 (9th Cir. 2004).  Further, if objective factors establish probable cause for a search or seizure, the officers' subjective motivations are irrelevant.  See Tatum v. City & County of San Francisco, 441 F.3d 1090 (9th Cir. 2006).  The officers' collective knowledge of the facts, not each individual officer's personal knowledge of the facts, is assessed in determining whether probable cause existed.  See United States v. Ramirez, 473 F.3d 1026 (9th Cir. 2007).  Finally, it is well-established that an arrest conducted pursuant to a facially valid warrant does not violate the Fourth Amendment.  See Baker v. McCollan, 443 U.S. 137 (1979).

As to plaintiff's claim that defendants conducted an illegal search, the court agrees with defendants that the claim is foreclosed because the undisputed evidence establishes that the officers had collective knowledge of facts sufficient to establish probable cause that plaintiff was violating the law.  Specifically, the officers observed evidence of illegal streambed alterations.  With respect to the search of plaintiff's cabin, the court likewise finds that judgment in favor of

defendants is appropriate because plaintiff repeatedly gave his consent for the officers to enter the cabin.  Finally, plaintiff cannot prevail on any claim that his arrest violated the Fourth Amendment because the arrest was carried out pursuant to a facially valid warrant.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' motion for summary judgment (Doc. 43) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 8, 2016

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE

9