# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT ALAN GIBBS,  No. 2:13-CV-2631-KJM-CMK

    Plaintiff,

    vs.

AMENDED
FINDINGS AND RECOMMENDATIONS

BOYD, et al.,

    Defendants.

_____/

    Plaintiff, who is proceeding pro se, brings this civil rights action. Pending before the court is defendants' motion for summary judgment (Doc. 43).[1]

    The matter is before the undersigned following the District Judge's September 30, 2016, order. In that order, the court outlined the following factual summary:

> On December 23, 2012, plaintiff's car was stuck in snow on the highway so he called the Shasta Sheriff's Department for help. Deputy Edwards and Sgt. Jackson responded and found plaintiff walking down the highway with a shotgun. According to Deputy Edwards' report, plaintiff seems mentally unstable and angry. After dropping plaintiff off at a Motel 6 (as plaintiff requested), Deputy Edwards took plaintiff's shotgun

---

[1] The motion is brought by defendants Boyd and Little ("state defendants"). The motion for summary judgment filed by remaining defendants Edwards and Jackson ("county defendants") was addressed in findings and recommendations issued on March 4, 2016.

1

| | for safekeeping, over plaintiff's objection. Deputy Edwards filed a report with the District Attorney, who then filed criminal charges against plaintiff for being a felon in possession of a weapon, and a warrant was issued for his arrest. Within days of the seizure of his gun, plaintiff informed Sgt. Jackson and employees at the District Attorney's office that plaintiff did not have a felony on his record; the conviction at issue was a "wobbler" that had been reduced to a misdemeanor, but Sgt. Jackson contends the documents were unclear.
More than three months later, on March 8, 2013, Fish and Game Wardens Boyd and Little executed the Shasta County warrant at plaintiff's home and arrested him. Little and Boyd initially sought to contact plaintiff about a complaint that he was involved in "illegal streambed alteration," but then discovered the warrant for his arrest and chose to execute it. After his arrest, plaintiff spent three days in jail and then posted bail. The felon in possession charge was dropped at arraignment. . . . |

The District Judge concluded that ". . .parts of plaintiff's complaint. . .cast doubt on the facial validity of the warrant and the reasonableness of defendants' reliance on it." The court added:

| | . . .On page four of the complaint, plaintiff asserts he was charged with being a felon in possession of a gun, even though he was not a felon when he possessed the gun. This invalid charge then led to the issuance of an arrest warrant for a crime plaintiff did not commit. Plaintiff outlines his efforts to communicate the error to both the Shasta Sheriff's Department and the District Attorney's office. The record also demonstrates there was a three month lapse between the issuance of this arrest warrant and its execution, during which the invalid basis for the warrant was never addressed, despite plaintiff's efforts. Lastly, the record shows plaintiff's "felon in possession" charge was dropped at arraignment.
Based on these facts, the court finds there may be a triable issue over the validity of plaintiff's arrest warrant and the reasonableness of plaintiff's arrest. . . . |

The matter was referred back to the undersigned for "further analysis to properly resolve defendant's [sic] motion."

///
///
///
///
///
///

# I. BACKGROUND

**A.  Plaintiff's Allegations**

This action proceeds on the original complaint against defendants Boyd, Little, Edwards, and Jackson. Plaintiff claims:

> My property was stolen by dep. Edwards on 12/23/12. My home was searched without a warrant on 3/8/13 by Fish and Game officers Little, Boyd, and Gaveki based upon a false report by Edwards. Sgt. Jackson of Shasta Sheriff knew and did nothing. I had a gun put to my head. Have not been the same since. . . .

In a statement attached to the complaint, plaintiff adds:

> On December 23rd of 2012, I dialed 911 to alert authorities that my truck was stuck in the snow hanging precariously over a cliff. After two days of being stuck in snow and mud, I decided to evacuate from my cabin at Bear Gulch (French Gulch). With me were my three small dogs who were tired and not minding very well. I was wet and muddy over my entire body and had actually slept for about 3 hours in my wet clothes the night before. Night time was approaching yet again and I asked the Sheriff's if they could pick me up or send a cab if I could make it out to the highway. I then started making my way to the highway with my dogs and also a shotgun that belonged to a friend of mine. When I made it to the road and made contact with the deputies they seemed perturbed that they had to come to this side of the county and they were inquiring sarcastically as to how long I had been "tramping." I told them that I was not tramping and that I had a cabin in the area. Even though I had peacefully given them my shotgun and it was now safely stowed in one of the patrol vehicles, they still insisted upon putting me in the back and handcuffing me. Deputy Edwards then transported me to the Motel 6 on Twin View Blvd. Where I have stayed many times. After uncuffing me and allowing me to make sure there was a room available, Deputy Edwards then informed me that he wanted to take my shotgun for "safe keeping." I told him that taking my shotgun was unnecessary that there was no prohibition against weapons at Motel 6, and that he did not have my permission to do so. Deputy Edwards then told me that he was going to take my weapon anyway. Because Deputy Edwards is a law enforcement officer, I was not going to argue further, and Edwards took the gun. He told me I could claim the gun the next day at the Sheriff's department. He told me to contact the property officer. But when I contacted the property officer the next day she told me that I was being charged with felon in possession and that I could not come pick it up.
>
> Throughout January and February, as mentioned in my letter, I did complain of what was happening to several Sheriff's employees and several people at the DA's office, including Sgt. Jackson, Sgt. Dupreaux, the investigator, and secretaries I spoke to at the DA's. Almost all of the people I spoke to were very unhelpful, seemed afraid to take action, and

3

seemed more than willing to do anything except help me to resolve the situation. As I ran into more and more brick walls, I found myself suffering from greater and greater level of anxiety and near psychotic levels of anger and frustration. All I wanted them to do was admit they were wrong and to make amends. It was their continued denial and complete apathy towards me that was the greatest disrespect and actually aggravated the situation beyond belief. Essentially, they wanted to get off on a false arrest on the cheap. They made a huge mistake and didn't want to pay for it. They didn't care how it was affecting me or if it continued to cause me psychological damage. Even if I was suicidal and completely depressed for days and weeks at a time, as long as they didn't have to pay, they were fine with it.

On March 8th, 2013, one day before my 41st birthday, while in my yard raking up leaves, I simultaneously heard and saw three men with pistols and a rifle and a german shepard [sic] run very fast into my yard screaming for me to lay on the ground. At the time, I did not know these men were Fish and Game and one of them as he ran into the yard was pointing a high powered rifle in the general direction and level with my head. I complied and layed [sic] on the ground at which point I did notice that these men wore uniforms. Within a few second I ascertained who these men were and why they were there. Immediately into interviewing me, the officer I would later learn was Brian Boyd began asking me where my guns were. When I said I had no guns, officer Boyd said I had two 38 caliber pistols registered to me. I have never in my life owned a registered 38 caliber pistol. It seemed to me at the time that it was just an excuse to make sure I didn't have any weapons (in essence, so the officers could come in with guns drawn since they didn't have any solid intelligence on me and didn't know that they were coming into). Officer Boyd also asked me where my "partner" was, when I said I lived alone and had lived alone the entire time I have been up here, he said we had information that there was someone else up here living with you. Again, I believe that this was Boyd's fabricating intelligence so that he could come in with 3 men well armed, as added security to him and his men, with no regard to whether or not I was alone unarmed and would go peacefully. Despite the fact that they had only the false arrest warrant for the Edwards case, Officer Boyd and Officer Little did nonetheless conduct an illegal search of my residence and property. Officer Boyd and Officer Little both entered my cabin and began asking me "where is the dope" to which I replied "I don't have any dope." Officer Little noticed some plastic tubs and asked me what was in them. I told him it was dirty clothes and hangers, which it was. They also asked me what was in the jars in my rafters. I told them they were empty. When we went back out into the yard Boyd asked again where the dope was. I showed him the six plants I had that were about a foot tall inside a dog cage. After hog tying me with some kind of a rope and leaving me in the custody of Officer Gauweki, both Officers Boyd and Little got into their truck and drove up a logging road on my property, apparently to search for more marijuana. I was then transported to Shasta County Jail on the felony warrant based upon Edwards' complaint. My dogs were left in my cabin by Fish and Game and I was able to leave them enough water and food for about a day. I was told by Boyd that I would

4

probably be processed out in a few hours.  But when I got to the jail, I found out that my bail was $100,000, the premium of which I would have to pay was $10,000 cash, payable to the bondsmen within one month of my release.  On Monday, March 11th, after three days in jail, not knowing if my dogs were ok and not knowing how much longer I would have to wait to get some other kind of release, I agreed to be bonded out.

B. **Defendants' Evidence**

According to defendants:

Plaintiff Robert Alan Gibbs (Plaintiff) alleges that Defendant Brian Boyd (Warden Boyd) and Defendant DeWayne Little (Lieutenant Little), officers of the Department of Fish and Wildlife (DFW), violated his civil rights by entering his property without a warrant based on a false report by Shasta County Sheriff Deputies, and that they entered his property and cabin illegally, without his consent, to search for marijuana.
This case was initiated when DFW received complaints that Plaintiff was unlawfully performing streambed alterations.  Defendants' primary job duties include investigation of Fish and Game Code violations, such as unlawful streambed alterations.
Warden Boyd, who headed the investigation of the streambed alteration complaint for DFW, found that Plaintiff had a $100,000 weapons-related felony warrant for his arrest.  Warden Boyd verified the warrant with the Shasta County Sheriff's Department, which issued the warrant.  He also verified the warrant with his DFW dispatch.  Warden Boyd also found that Plaintiff should be considered dangerous.  He took reasonable precautions to ensure safe execution of the arrest warrant and property search by, among other things, requesting the assistance of two other DFW officers, including Lieutenant Little.

\* \* \*

On March 8, 2013, at approximately 1:00 p.m., Warden Boyd, his police K-9, Lieutenant Little, and DFW Warden Aaron Galwey (collectively the officers), responded to investigate complaints that Plaintiff Robert Alan Gibbs was unlawfully performing streambed alterations in a rural mountain area southeast of Buckhorn Summit on Highway 299. (Citations to defendants' statement of undisputed facts and evidence omitted).

\* \* \*

Based on the reports he had received about Plaintiff [regarding the outstanding weapons-related felony warrant], and because Plaintiff was considered dangerous, Warden Boyd did not think he should make contact with Plaintiff by himself.  He requested the assistance of Lieutenant Little and Warden Aaron Galwey.  He thought their assistance would help to ensure that Plaintiff's arrest and the investigation of Fish and Game Code violations were executed safely.

* * *

When the officers attempted to make contact with Plaintiff on March 8, 2013, Warden Boyd Drove a DFW truck and Lieutenant Little drove a DFW truck with Warden Galwey as his passenger. When the officers reached the road to Plaintiff's property, Warden Boyd parked his truck off of highway 299 at the base of the road to Plaintiff's property, then he and his police K-9 entered the bed of Lieutenant Little's truck.

On the drive to Plaintiff's property, Warden Boyd observed environmental damage on the adjacent landowner's property, which he believed Plaintiff had caused based on the complaints he had received and which Plaintiff later admitted. Warden Boyd photographed streambed alteration where Plaintiff admittedly filled stream courses and installed culverts without notification.

* * *

On the drive to Plaintiff's property, the officers encountered two gates that were on property adjacent to Plaintiff's property. The officers parked at the third gate, which was the entrance to Plaintiff's property. Warden Boyd exited Lieutenant Little's pickup with his police K-9 and walked around the gate, through open fields, and down a narrow roadway. Neither Warden Boyd nor Lieutenant Little ever opened, passed through, or passed over a gate, fence, or any other enclosure to enter Plaintiff's property.

Warden Boyd saw smoke coming up through the trees ahead of him. Warden Boyd and Lieutenant Little had handguns, and Warden Galwey had a long gun. The officers made contact with Plaintiff outside his residence and arrested him for the weapons-related felon warrant. Plaintiff did not resist the arrest. At no time did Lieutenant Little or Warden Boyd point a gun at Plaintiff's head.

* * *

Lieutenant Little was concerned about the animals in Plaintiff's cabin, but he was not going to enter the house unless Plaintiff asked. Plaintiff asked Lieutenant Little to take care of the dogs and lock the dogs in his house. Plaintiff also asked Lieutenant Little to retrieve personal items from his cabin.

Before entering the house, Lieutenant Little explicitly stated to Plaintiff: "I am confirming right now that you are requesting that I enter your house to retrieve personal items and secure your dogs." Plaintiff responded yes, he authorized Lieutenant Little to enter his house. Lieutenant Little then stated: "You are sure you want me to go into your house and based on your consent alone, I have your permission to enter to secure your dogs and retrieve personal items." Plaintiff again confirmed his express consent for Lieutenant Little to enter his cabin. Lieutenant Little confirmed Plaintiff's consent a third time, and again Plaintiff agreed.

///

Defendants' statement of undisputed facts is supported by defendants' declarations as well as excerpts from plaintiff's deposition in this matter. Defendants' statement of undisputed facts is also supported by defendants' request for judicial notice. Specifically, defendants seek judicial notice of a January 4, 2013, warrant for plaintiff's arrest signed by a judge of the Shasta County Superior Court.[2]

### C. Plaintiff's Evidence

In addition to the verified complaint, discussed in the District Judge's order, plaintiff submitted a declaration in opposition to defendants' motion on December 1, 2016.[3] Despite the District Judge's admonition to "include relevant evidence," plaintiff does not provide any evidence beyond his four-page declaration which largely repeats the allegations in the complaint.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.

---

[2] The court may take judicial notice pursuant to Federal Rule of Evidence 201 of matters of public record. See U.S. v. 14.02 Acres of Land, 530 F.3d 883, 894 (9th Cir. 2008). Thus, this court may take judicial notice of state court records, see Kasey v. Molybdenum Corp. of America, 336 F.2d 560, 563 (9th Cir. 1964), as well as its own records, see Chandler v. U.S., 378 F.2d 906, 909 (9th Cir. 1967).

[3] Though plaintiff failed to timely oppose defendants' motion, the District Judge exercised her discretion to grant plaintiff additional time to do so. Specifically, plaintiff was granted time to "file an opposition to defendants' motion, and to include relevant evidence."

See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

///

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

### III. DISCUSSION

Plaintiff claims that defendants violated his Fourth Amendment rights by conducting an illegal search of his property and cabin. It also appears that plaintiff claims his arrest violated the Fourth Amendment. To prevail on such claims in a § 1983 action, plaintiff must prove that the officers acted without probable cause. See United States v. Collins, 427 F.3d 688 (9th Cir. 2005). Defendants argue that plaintiff's Fourth Amendment claims fail as a matter of law because the undisputed evidence establishes that their actions were supported by probable cause, plaintiff's consent, as well as a facially valid warrant.

Whether probable cause existed is a question of law. See Beck v. Ohio, 379 U.S. 89 (1964). Probable cause exists when officers have a reasonable belief, under the totality of the circumstances, in the probability of criminal activity. See Illinois v. Gates, 462 U.S. 213 (1983); see also Dubner v. City & County of San Francisco, 266 F.3d 959 (9th Cir. 2001); Torres v. City of Los Angeles, 548 F.3d 1197 (9th Cir. 2008). Law enforcement officers may possess probable

cause even where the officers' reasonable belief is mistaken.  See Beier v. City of Lewiston, 354 F.3d 1058 (9th Cir. 2004).  Further, if objective factors establish probable cause for a search or seizure, the officers' subjective motivations are irrelevant.  See Tatum v. City & County of San Francisco, 441 F.3d 1090 (9th Cir. 2006).  The officers' collective knowledge of the facts, not each individual officer's personal knowledge of the facts, is assessed in determining whether probable cause existed.  See United States v. Ramirez, 473 F.3d 1026 (9th Cir. 2007).  Finally, it is well-established that an arrest conducted pursuant to a facially valid warrant does not violate the Fourth Amendment.  See Baker v. McCollan, 443 U.S. 137 (1979).

### A. Search of Plaintiff's Property and Cabin[4]

As to plaintiff's claim that defendants conducted an illegal search, the court agrees with defendants that the claim is foreclosed because the undisputed evidence establishes that the officers had collective knowledge of facts sufficient to establish probable cause that plaintiff was violating the law.  Specifically, the officers observed evidence that plaintiff had pushed fill into stream courses, in violation of California Fish and Game Code § 1602(a).  Plaintiff has not provided any evidence to create a genuine dispute of material fact on this issue.  Moreover, to the extent plaintiff claims defendants violated his Fourth Amendment rights by entering onto his land, defendants are entitled to judgment as a matter of law under the open fields doctrine.  See Hester v. United States, 265 U.S. 57 (1924).

With respect to the search of plaintiff's cabin, the court likewise finds that judgment in favor of defendants is appropriate because plaintiff repeatedly gave his consent for the officers to enter the cabin.  See Morgan v. United States, 323 F.3d 776 (9th Cir. 2003).

///
///
///

---

[4] The District Judge expressed no disagreement with this portion of the court's analysis.

B. **Plaintiff's Arrest**

Several courts have now addressed the facts concerning the arrest warrant in this case and its validity. The case was first addressed in the context of plaintiff's small claims lawsuit in the Shasta County Superior Court against the Shasta County Sheriff's Department. Following a bench trial, the court issued a written decision on March 18, 2014. In that decision, the court stated:

> This case presents the question whether the County has liability to reimburse a defendant for the bond premium paid by him where the underling criminal charges are later dismissed. The court has found no case addressing this specific factual situation.
>
> The court instead examines the plaintiff's claim as one for damages stemming from false imprisonment. For purposes of analysis only, the court accepts as true the facts as offered by plaintiff that due to actions in another county a felony conviction appeared on the plaintiff's computerized law enforcement records, and that the conviction should not have so appeared, the felony charges having been dismissed in that other county. The court also finds the following facts were established by the evidence at trial:
>
> 1) The plaintiff was in possession of a firearm at the time of contact by a sheriff's deputy;
>
> 2) That the same sheriff's deputy checked the computerized law enforcement records and found that the plaintiff had a felony conviction;
>
> 3) That based on the recorded felony conviction, the deputy determined there was probable cause to believe the plaintiff had committed the crime of being a felon in possession of a firearm;
>
> 4) That the district attorney filed a criminal complaint and sought and obtained a court ordered arrest warrant;
>
> 5) The warrant was regular on its face;
>
> 6) That the department of Fish and Game executed the warrant and took the plaintiff into custody;
>
> 7) That the plaintiff posted bail to get out of custody, at the cost of $10,000.00; and
>
> 8) That the criminal complaint was dismissed at arraignment.

> The court notes that there was a factual dispute about whether the plaintiff consented to the deputy taking possession of the firearm or not. The court finds it unnecessary to resolve this dispute as immaterial to the present controversy.

Addressing the merits of plaintiff's false imprisonment claim, the court ruled against plaintiff concluding that liability did not exist because the arrest warrant was regular on its face and, therefore, provided a lawful reason to take plaintiff into custody. The court specifically found: "The fact that the sheriff, or his agent, did not investigate whether the computerized law enforcement record of the conviction was in error is not sufficient to show malice."

The facts concerning issuance of the arrest warrant were also discussed by the District Judge, who offered the following summary in her September 30, 2016, order:

> On December 23, 2012, plaintiff's car was stuck in snow on the highway so he called the Shasta Sheriff's Department for help. Deputy Edwards and Sgt. Jackson responded and found plaintiff walking down the highway with a shotgun. According to Deputy Edwards' report, plaintiff seems mentally unstable and angry. After dropping plaintiff off at a Motel 6 (as plaintiff requested), Deputy Edwards took plaintiff's shotgun for safekeeping, over plaintiff's objection. Deputy Edwards filed a report with the District Attorney, who then filed criminal charges against plaintiff for being a felon in possession of a weapon, and a warrant was issued for his arrest. Within days of the seizure of his gun, plaintiff informed Sgt. Jackson and employees at the District Attorney's office that plaintiff did not have a felony on his record; the conviction at issue was a "wobbler" that had been reduced to a misdemeanor, but Sgt. Jackson contends the documents were unclear.
> More than three months later, on March 8, 2013, Fish and Game Wardens Boyd and Little executed the Shasta County warrant at plaintiff's home and arrested him. . . .

Based on these facts, the arrest warrant was sought by the District Attorney following Deputy Edwards' report of the December 23, 2012, encounter with plaintiff where plaintiff was found in possession of a shotgun. Based on a felony conviction from another county, the District Attorney alleged that plaintiff was a felon in possession of a weapon and obtained a warrant for plaintiff's arrest from the Shasta County Superior Court. While plaintiff contended that the prior conviction at issue was a "wobbler" and not a felony and, therefore, he was not in fact a felon-in-possession, Sgt. Jackson of the Shasta County Sheriff's Department

1  contended that the documents on that issue were unclear. As the District Judge further explains
2  in her order:

> . . .Plaintiff outlines his efforts to communicate the error to both the <u>Shasta Sheriff's Department</u> and the <u>District Attorney's office</u>. The record also demonstrates there was a three month lapse between the issuance of this arrest warrant and its execution, during which the invalid basis for the warrant was never addressed, despite plaintiff's efforts. (Emphasis added).

As also outlined by the District Judge, the felon-in-possession charge was ultimately dropped when plaintiff was arraigned following his arrest. No evidence has been presented showing that either defendant Boyd or Little, or anyone with the Department of Fish and Game, had any knowledge of plaintiff's challenge to the warrant before it was executed. In fact, the undisputed evidence shows that defendant Boyd confirmed the existence of the warrant with the procuring agency – the Shasta County Sheriff's Department – before proceeding to execute the warrant. As defendants observe, despite plaintiff's efforts to address problems with the warrant, they had no reason to believe that the warrant was actually invalid prior to executing it.

Plaintiff cannot prevail on any claim that his arrest violated the Fourth Amendment because the arrest was carried out pursuant to a facially valid warrant. <u>See</u> <u>Baker</u>, 443 U.S. at 144; <u>see also</u> <u>Erdman v. Cochise County</u>, 926 F.2d 877, 882. Here, the undisputed evidence establishes that a felony arrest warrant was issued by a judge of the Shasta County Superior Court on January 4, 2013. Defendants were not required to second-guess the judge's assessment. <u>See</u> <u>Arnsberg v. United States</u>, 757 F.2d 971, 981 (9th Cir. 1985), <u>cert. Denied</u>, 475 U.S. 1010 (1986).

The District Judge stated that ". . .parts of plaintiff's complaint. . .cast doubt on the <u>facial validity</u> of the warrant and the reasonableness of defendants' reliance on it." (emphasis added). Respectfully, the undersigned does not agree. To be certain, plaintiff's allegations regarding the arrest warrant cast doubt on the <u>factual validity</u> of the warrant. Specifically, at the time the felon-in-possession arrest warrant was issued it was uncertain whether plaintiff actually

had a felony conviction from another county, and the felon-in-possession charge was ultimately dismissed at arraignment. Nonetheless, at the time defendants executed the warrant, and even though it turned out not to be factually valid, the fact remains that the arrest warrant was valid on its face. See Baker, 443 U.S. at 144 (concluding Fourth Amendment not violated even when wrong person arrested because arrest warrant was facially valid). Because the January 4, 2013, felony arrest warrant was valid on its face at the time it was executed by defendants on March 8, 2013, plaintiff cannot prevail on his Fourth Amendment claim even though the warrant was not valid in fact.

Citing the Supreme Court's decision in Whiteley v. Warden, 401 U.S. 560 (1971), the Third Circuit Court of Appeals in Berg v. County of Alleghany, 219 F.3d 261 (3rd Cir. 2000), concluded that a Fourth Amendment violation had occurred because "an erroneously issued warrant cannot provide probable cause for an arrest." See Berg, 291 F.3d at 269-270. Berg and Whiteley are distinguishable from the undisputed facts of this case which show that the felon-in-possession arrest warrant was not "erroneously issued." To the contrary, it was issued based on plaintiff's possession of a shotgun, a prior felony conviction from a different county (which plaintiff alleges was a "wobbler," not a felony), and an affidavit presented to a judge of the Shasta County Superior Court. Notably, as found by the Shasta County Superior Court in plaintiff's small claims case, the warrant was based on probable cause, unlike the warrant at issue in Whitley and Berg.

Even assuming that defendants violated plaintiff's clearly established Fourth Amendment rights by arresting him pursuant to a warrant which was not valid in fact, the court finds that defendants are entitled to qualified immunity. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341

1 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether the right was clearly established. See id. The final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct violated the alleged right. See id. at 205. The government official is entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see also Saucier, 533 U.S. at 205.

For purposes of the qualified immunity analysis, the court will presume for the moment that defendants violated plaintiff's clearly established rights under the Fourth Amendment by arresting him pursuant to a warrant which was in fact not valid. Defendants are entitled to qualified immunity because they reasonably believed the arrest warrant was valid even though that belief was mistaken. Specifically, the warrant was signed by a Shasta County Superior Court judge and confirmed by the Shasta County Sheriff's Department just prior to defendants executing it.

Plaintiff would be able to overcome qualified immunity by presenting some evidence to create a genuine dispute as to whether defendants knew the warrant was invalid prior to its execution. Plaintiff, however, has presented absolutely no such evidence. While plaintiff claims that defendants are corrupt and merely trying to "fulfill their quotas," plaintiff has not presented any evidence showing that defendants knew the warrant was invalid when they executed it. To the contrary, the undisputed evidence, as well as the Shasta County Superior Court's findings, confirm that the warrant was regular and facially valid when plaintiff was arrested.

/ / /

/ / /

## IV. CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' motion for summary judgment (Doc. 43) be granted.

These amended findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 1, 2017

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE